<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HUMANA INC.,<br><br>                Plaintiff,<br><br>        v.<br><br>MERCK & CO., INC. *et al.*,<br><br>          Defendants. | Case No. 2:23-cv-23023 (BRM) (LDW)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants Merck & Co., Inc. ("Merck & Co."), Merck Sharp & Dohme LLC (f/k/a Merck Sharp & Dohme Corp.), Schering-Plough Corporation ("Schering-Plough"), and Schering Corporation ("Schering") (collectively, "Merck")[1] Partial Motion to Dismiss (ECF No. 72) Plaintiff Humana Incorporated's ("Humana") Third Amended Complaint

---

[1] On February 21, 2025, defendants Glenmark Pharmaceuticals Ltd. and Glenmark Pharmaceuticals Inc. USA (together, "Glenmark") were voluntarily dismissed and, as such, are no longer parties to this action. (ECF No. 67.)

("Third Amended Complaint") (ECF No. 61) pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").[2, 3] Humana opposed the Motion (ECF No. 73), and Merck replied (ECF No. 74).

Having reviewed and considered the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Merck's Partial Motion to Dismiss (ECF No. 72) is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

For the purposes of this Motion, the Court accepts the factual allegations in the Third Amended Complaint as true and draws all inferences in the light most favorable to Humana. *See Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

The factual and procedural backgrounds of this matter are well-known to the parties and were previously recounted in depth by the Court in its prior opinion granting in part and denying in part Defendants' Partial Motion to Dismiss Humana's Second Amended Complaint. (ECF No. 57.) Accordingly, the Court will recount only the factual background and procedural history

---

[2] This case is one of two that were originally filed in the District of New Jersey, *see Humana Inc. v. Merck & Co., Inc., et al.*, Case No. 2:23-cv-23023 (D.N.J. Sept. 22, 2021), and then consolidated in a Multi-District Litigation ("MDL") in the Eastern District of Virginia by the JPML pursuant to 29 U.S.C. § 1407, *see Humana Inc. v. Merck & Co, et al.*, Case No. 2:21-cv-01007 (E.D. Va. Oct. 18, 2021); *Centene Corp. v. Merck & Co, et al.*, Case No. 2:21-cv-17363 (E.D. Va. Oct. 18, 2021). At the time Humana was joined to the MDL, there were at least seven other actions ongoing with common questions of fact. On December 12, 2023, the JPML remanded both cases to this Court. (*See* ECF No. 8.) The two cases are represented by the same attorneys and raise mostly the same claims against Defendants, who submitted identical briefs in support of their Motions to Dismiss against the two Plaintiffs.

[3] The Motion to Dismiss the Third-Party Complaint or, alternatively, Transfer the Third-Party action currently pending before the Court will be addressed in a separate opinion. (ECF No. 83.)

associated with this Motion, and will specifically omit discussion of the regulatory structure for approval of new drugs and the alleged significance of Merck's cholesterol-reducing drugs, which were both recounted in this Court's prior opinion. (*Id.*) Generally, this case concerns Merck's alleged monopolization scheme relating to two of its prescription cholesterol-lowering drugs, Zetia and Vytorin.

### A.    The Parties

Humana is a Delaware corporation with its principal place of business in Louisville, Kentucky, providing healthcare related services, including "insuring risk for prescription drug costs for more than 8 million members in all 50 States, the District of Columbia, and Puerto Rico." (ECF No. 61 ¶ 9.) When a Humana member fills a prescription for Zetia, Vytorin, or generic equivalents at a pharmacy, Humana pays a large share of the cost; for example, Humana has paid hundreds of millions of dollars to pharmacies for prescriptions for Zetia, Vytorin, and generic equivalents dispensed to Humana members. (*Id.* ¶ 10.) Humana has also spent millions of dollars on both Zetia and Vytorin dispensed by its own mail-order pharmacy, Humana Pharmacy, Inc. ("HPI"), as well as in retail pharmacy locations. (*Id.* ¶ 11.) HPI purchases Zetia, Vytorin, and other drugs relevant to this action from distributors like AmerisourceBergen Drug Corporation ("ABDC"), who in turn purchases its drugs directly from Defendants. (*Id.* ¶ 12.) In an agreement made effective on May 6, 2022, between Humana, HPI, and ABDC, ABDC assigned its rights to assert claims against Defendants arising out of or relating to ABDC's purchases of Zetia and Vytorin which were later resold to HPI from 2011 to present to Humana. (*Id.*) It is out of this agreement that Humana's federal antitrust claims arise. (*Id.* ¶ 13.)

Merck & Co. is a corporation organized under the laws of New Jersey. (*Id.* ¶ 14.) Merck Sharp & Dohme Corp. is a subsidiary of Merck & Co. organized under the laws of New Jersey and the assignee of patents relevant to this matter. (*Id.* ¶ 15.) MSP Singapore Co. LLC is also a

subsidiary of Merck & Co., Inc. and formerly the exclusive licensee of the relevant patents. (*Id.* ¶ 21.) Schering-Plough was also a corporation organized under the laws of New Jersey, as was Schering, a wholly owned subsidiary of Schering-Plough and the original assignee of the relevant patents. (*Id.* ¶¶ 16–17.) Merck & Co. acquired and merged into Schering-Plough in 2009, thereafter changing its name to Merck & Co., Inc., and the company originally known as Merck & Co., Inc. became Merck Sharp & Dohme Corp. (*Id.* ¶ 18.)

Par Pharmaceutical, Inc. is a corporation under the laws of New York. (*Id.* ¶ 20.) Par Pharmaceutical, Inc. is a subsidiary of Endo International plc ("Endo"), an Irish corporation with U.S. headquarters in Malvern, Pennsylvania. (*Id.*) Endo acquired Par Pharmaceutical Holdings, Inc. and its subsidiaries (including Par Pharmaceutical, Inc.) and merged it with its existing generics subsidiary, Qualitest Pharmaceuticals in September 2015. (*Id.*) The Third Amended Complaint refers to all of Par's predecessors and successors, collectively, as "Par." (*Id.*)

**B.    Defendants' Allegedly Anticompetitive Conduct**

Humana alleges Defendants engaged in an overarching scheme to monopolize the distribution of Zetia and Vytorin in the U.S., including a purportedly anticompetitive settlement agreement ("Zetia Settlement Agreement") between Merck and Glenmark and alleged unlawful business arrangements between Merck, Par, and Glenmark, in violation of federal and state antitrust laws, and state consumer protection and unjust enrichment laws. (*Id.* ¶ 8.)

**1.    Merck's Allegedly Inequitable Conduct During FDA Approval Process of the '115 and RE '721 Patents, and Glenmark's ANDA Application for a Generic Version of Zetia**

The Third Amended Complaint alleges Schering, through its attorney Anita W. Magatti ("Magatti"), prosecuted a family of patents, including U.S. Patent No. 5,767,115 (the "'115"

patent), from the 1990s through the 2000s, during which time Schering, Merck[4], and MSP Singapore had a duty to disclose "all information known . . . to be material to patentability" to the U.S. Patent and Trademark Office ("USPTO"). (*Id.* ¶¶ 67–68 (quoting 37 C.F.R. § 1.56).) This continued prosecution allowed Merck to obtain reissue to correct two "mistakes" in the patents, first with respect to the RE '721 patent and then with U.S. Reissue Patent No. RE 42,461 (the "'461" patent). (*Id.* ¶ 67.) However, Schering, Merck, and MSP Singapore allegedly did not disclose potentially relevant publications, such as one concerning laboratory experiments that resulted in the metabolization of compounds SCH48461 and SCH58235, also known as ezetimibe (generic Zetia), using well-known methods. (*Id.* ¶¶ 69–71.) Therefore, Defendants were allegedly able to obtain patent claims that impermissibly covered naturally occurring, widely known compounds. (*Id.* ¶ 71.)

Two sets of alleged inequitable conduct are particularly relevant here. (*See id.* ¶¶ 74–84.) The first relates to the '115 patent prosecution. On July 21, 1992, Schering filed International Patent Application No. PCT/US92/05972, later published as "WO '048," which included data from experimental testing of compounds like SCH48461 administered *in vivo* to hamsters. (*Id.* ¶¶ 74–75.) Humana alleges at least two inventors (namely, Duane Burnett ("Burnett") and John Clader ("Clader")) "were aware . . . that metabolites within the scope of one or more claims of the '115 patent were necessarily produced when SCH48461 was administered to hamsters, as described in WO '048" because they are named inventors on the patent. (*Id.* ¶¶ 74, 76.) Additionally, Burnett and Clader were allegedly aware "that metabolites within the scope of the '115 patent were necessarily produced when SCH48461 was administered to hamsters," after a manuscript entitled

---

[4] Humana does not identify the specific Merck entity here or elsewhere, and generally refers to "the Merck Defendants" throughout the Third Amended Complaint. (*See, e.g.*, ECF No. 61 ¶ 26.)

"In Vivo Metabolism-Based Discovery of a Potent Cholesterol Absorption-Inhibitor, SCH58235, in the Rat and Rhesus Monkey through the Identification of the Active Metabolites of SCH48461" was published in the Journal of Pharmacology and Experimental Therapeutics on June 30, 1997 ("June 1997 manuscript"). (*Id.* ¶ 76.) Despite Schering's submitted disclosure statement to the USPTO listing WO '048 as "provid[ing] additional background information," Burnett and Clader, and potentially others, were aware that it "did significantly more than simply provide 'background' for the pending application" but, rather, described that the metabolites claimed in the application that became the '115 patent were "naturally occurring metabolites of the SCH48461 compound[.]" (*Id.* ¶ 77.)

The second set of misrepresentations concerns the allegation that Schering scientists intentionally concealed the true inventorship of the '115 and RE '721 patents. (*Id.* ¶ 78.) Humana alleges that, "[i]n an apparently magnanimous gesture," Schering scientist Dr. Adriano Afonso ("Afonso") "removed his name from the list of inventors during preparation of the patent application to help promote [Dr. Stuart] Rosenblum's [("Rosenblum")] career[,]" even though it was actually Afonso who invented the compounds 4E and 4F (discussed in claim 7 of the patents), which are "arguably the most important compound[s] for purposes of developing ezetimibe[.]" (*Id.* ¶¶ 78–79, 81–82.) In addition to Rosenblum, Schering's attorneys, including Schering's Chief Patent Counsel James Nelson ("Nelson"), allegedly knew by around 2005 of the incorrect inventorship problem but did not correct it. (*Id.* ¶¶ 72, 78–79.)

Under 21 U.S.C. § 355(b)(1)(A), manufacturers are required to inform the FDA by listing in their Orange Book any patents covering, as well as those *not* covering, the product, so generic companies can "assess whether to challenge infringement and/or validity of the patents." (*Id.* ¶ 85.) A patent is considered to "cover" a product when that product "meet[s] all the elements of at least

one 'claim' in the patent." (*Id.* ¶ 86.) Merck allegedly violated this statutory duty by listing some patents that did not cover Zetia and improperly asserting other patents against pharmaceutical companies seeking generic approval for the drug. (*Id.* ¶¶ 85, 87–89.) Specifically, Merck listed U.S. Patent No. 5,846,966 (the "'966" patent) as containing a combination of ezetimibe and a statin, despite knowing the product did not contain a statin. (*Id.* ¶ 87.) Therefore, "Merck knew that the '966 patent could not be infringed by the manufacture, use, offer to sell, sale, or importation of Zetia." (*Id.*) Merck also listed the RE '721 in both the Orange Books for Zetia and Vytorin, despite allegedly knowing RE '721 could only have covered Zetia. (*Id.* ¶ 88.) In doing so, Merck allegedly "knew or should have known that the patent was invalid" or otherwise unenforceable due to its "inequitable conduct[,]" as described above (*Id.* ¶ 89.)

Additionally, before its NDA was approved, Merck attempted to extend its Zetia patent protection. (*Id.* ¶ 90.) In particular, Merck filed U.S. Patent Application No. 10/136,968 (issued as U.S. Patent No. 7,030,106 (the "'106" patent)), which did not claim priority to the RE '721 patent and therefore "constituted prior art to the '106 patent." (*Id.* ¶¶ 91–92.) Merck purportedly listed the '106 patent in the Orange Book for Zetia, extending the drug's expiration date to July 25, 2022, through that patent's pediatric extension. (*Id.* ¶ 93.) However, because the '106 patent's "Field of the Invention" states, in part, "[t]he present invention relates to compositions and therapeutic combinations," and the '106 patent claims do not refer to combination use, "Merck knew that the '106 patent was invalid in view of at least the RE '721 patent." (*Id.* ¶¶ 93–95.)

Finally, with FDA approval for Zetia, Merck had a five-year exclusivity grant and an additional grant of pediatric exclusivity of six months for the RE '721 patent. (*Id.* ¶¶ 96–97.) On October 25, 2006—the first date on which other generic companies could file ANDAs for Zetia—Glenmark filed an ANDA for a generic version of Zetia. (*Id.* ¶ 98.) Glenmark's ANDA application

included a Paragraph IV Certification asserting the patents listed in Zetia's Orange Book, along with the RE '721, '966, and '106 patents, but the FDA could not approve the ANDA until the following year because of Merck's regulatory exclusivity. (*Id.*)

### 2. Merck Purportedly Patents Vytorin Using Same Zetia Patents, and Sues Generic Competitors for Alleged Infringement

In response to the looming expiration of Zocor's patent and regulatory exclusivity in 2006, Merck allegedly decided to combine Zocor and Zetia into a single tablet, with the aim of stretching Zetia's still-active patent protection over Zocor. (*Id.* ¶¶ 157–58.) In 2003, MSP Singapore filed an NDA for this new combination product, Vytorin, and received FDA approval on July 23, 2004, which gave Merck exclusivity until October 25, 2007. (*Id.* ¶ 158.) Merck marketed Vytorin as a "unique dual-inhibition therapy," even though Vytorin prescriptions contained the same combination of doses as Zocor and Zetia, which were often prescribed in tandem. (*Id.* ¶ 159.) According to Humana, Vytorin became a highly successful drug and generated billions of dollars in sales. (*Id.* ¶ 160.) After March 21, 2014, Merck's exclusive right over Vytorin was based on the RE '461 patent alone. (*Id.* ¶¶ 160–61.)

### 3. Schering's Lawsuit Against Glenmark Alleging Infringement of the RE '721 Patent

On March 22, 2007, Schering and MSP Singapore, as the patent's assignee and exclusive licensee, respectively, sued Glenmark in the U.S. District Court for the District of New Jersey alleging infringement of the RE '721 patent.[5] (*Id.* ¶ 99.) This lawsuit was allegedly meritless because Merck "effectively admitted" the '966 and '106 patents were invalid, unenforceable, and/or did not cover Zetia by failing to assert claims the patents would be infringed by the

---

[5] Humana alleges Schering was a plaintiff in several other patent actions relating to Zetia and Vytorin and, in filing this and other actions alongside Merck, Schering "had a vested economic interest" in Merck's efforts to maintain its monopolies over the two drugs. (*Id.* ¶ 99 n.11.)

Glenmark generic. (*Id.*) However, merely by initiating the suit, Schering and MSP Singapore triggered an automatic 30-month stay, during which time the FDA was prevented from approving Glenmark's ANDA until expiration of the 30 months or entry of a final judgement that the RE '721 patent was invalid, unenforceable, and/or not infringed. (*Id.*) In its responsive pleadings, Glenmark asserted various affirmative defenses and counterclaims "based on the invalidity and unenforceability of the RE '721 patent[,]" arguing Schering engaged in inequitable conduct and violated its duty of disclosure to the USPTO in its filing of the RE '721 patent with respect to the mischaracterization of WO '048 and Schering's failure to identify material scientific publications. (*Id.* ¶¶ 100–07.) While the lawsuit was ongoing, the FDA tentatively approved Glenmark's ANDA, giving it a 180-day exclusivity period as the first filer for a Zetia generic. (*Id.* ¶ 109.)

### 4. Schering and Glenmark Sign a Settlement Agreement, Which Includes an Alleged Reverse Payment Scheme

Less than four months after the FDA granted tentative approval to Glenmark's ANDA for Zetia, and while the parties were in settlement talks, Glenmark's lead negotiator sent Glenmark executives an email summary with key points from a meeting with Schering's general counsel. (*Id.* ¶ 111.) In that email, he noted "I . . . reminded [Schering's general counsel] of the fact that [the] court decision in favor of Glenmark will impact Vytorin product." (*Id.*)

On May 10, 2010, Schering, MSP Singapore, and Glenmark settled, agreeing that Glenmark would not release its generic Zetia drug until December 12, 2016. (*Id.* ¶ 112; *see* ECF No. 46-6, Ex. C.) The Zetia Settlement Agreement allegedly ensured the RE '721 patent would not be invalidated by the suit and protected "both Zetia and Vytorin from generic competition." (*Id.* ¶ 113.)

Under sections 5.2 and 5.4 of the Zetia Settlement Agreement, Glenmark would not launch its generic drug before December 12, 2016, and under section 5.3, Merck would not launch an

authorized generic version of its own "[d]uring any period of exclusivity to which Glenmark [wa]s entitled under 21 U.S.C. § 355(j)(5)(B)(iv) [180-day exclusivity], and through the expiration of [Merck's] rights under the RE '721 Patent and Ezetimibe Pediatric Exclusivity." (*Id.* ¶ 127.) In other words, Glenmark was free to launch its generic drug on December 12, 2016, Merck's exclusivity period for the RE '721 patent ended on April 25, 2017, and Glenmark's exclusivity expired on June 10, 2017. (*Id.*) Humana alleges this settlement was effectively a reverse payment scheme where Merck paid Glenmark to delay its generic release and gave it a period of generic exclusivity in exchange. (*Id.*)

Humana alleges this reverse payment scheme through multiple pieces of circumstantial evidence, including: (1) Merck's prior admissions that "marketing an [authorized generic] is in its economic interest"; (2) Merck's history of releasing authorized generics amidst competition from generic manufacturers; (3) the great success of Zetia, which indicated an authorized generic would likely have been profitable; (4) Glenmark's press release announcing its generic drug described it as "the first and only generic version" of Zetia in the U.S.; (5) Merck's decision not to launch an authorized generic during Glenmark's 180-day period of exclusivity, even though it was not prohibited by law and Merck had a done so in the past for other branded drugs; and (6) Glenmark's disclosure to its shareholders in May 2017 (before releasing its generic version), that it expected to capture more than 58% of combined brand and generic sales, a significantly larger market share than is typical for a generic manufacturer, and then did so within six months. (*Id.* ¶ 129.) This scheme was allegedly "worth substantially more than what Glenmark could have earned if it had prevailed in the patent litigation filed by Merck" and could not have been achieved by Glenmark even if it had defeated the infringement claims because the scheme ensured "six months of exclusive generic sales, free from competition from Merck's [authorized generic] or any other

generic competitors." (*Id.* ¶ 130.) Without the reverse payment scheme, generic versions of Zetia would have entered the market "at least as early as December 6, 2011, when Merck's regulatory exclusivity ended[,]" by which time Humana contends Glenmark would have either won at trial or settled on competitive terms. (*Id.* ¶ 132.) "By December 6, 2011, no impediments existed to the prompt approval and launch of generic Zetia other than Merck's assertion of infringement of the RE '721 patent." (*Id.* ¶ 133.)

### 5. The Distribution Agreement Between Glenmark and Par

While Schering's lawsuit was still ongoing and before the Zetia Settlement Agreement, Glenmark entered into an agreement with Par on April 30, 2010 ("Distribution Agreement"), by which Par would have the exclusive right to market, distribute, and sell Glenmark's generic version of Zetia in the United States in exchange for an upfront payment to Glenmark and a net profit-sharing arrangement. (*Id.* ¶ 118.) Under the Distribution Agreement, Glenmark was required to provide to Par "all documents or materials in its possession or control" relating to the ANDA patent litigation, "keep Par reasonably informed regarding material developments made with respect to any [l]itigation[,]" and confer with Par on "all material decisions with respect to the [l]itigation [which would] be made jointly[.]" (*Id.* ¶ 119.) Glenmark also agreed not to settle its suit with Schering/Merck without Par's "written consent" and to share any proceeds with Par in the event of a settlement. (*Id.* ¶ 120.) The Distribution Agreement also included a provision to create a joint Steering Committee within 30 days to advise, monitor, and otherwise oversee the marketing, distribution, and sale of the drug. (*Id.* ¶¶ 121–22.) Pursuant to the terms of the Agreement, Par

allegedly consented to the reverse payment scheme between Schering/Merck and Glenmark, *see supra* Section I.D.4. (*Id.* ¶ 124.)

### 6. Filings with Paragraph IV Certifications for Generic Zetia Products from Competing Manufacturers

Around April 2010, a second pharmaceutical company, Mylan Pharmaceuticals, Inc. ("Mylan") filed a Paragraph IV Certification for its own generic version of the branded drug. (*Id.* ¶ 147.) Merck filed a lawsuit against Mylan alleging infringement of the RE '721 and '966 patents (the "Mylan Litigation").[6] (*Id.*) "Mylan raised all the same defenses that Glenmark raised in its Zetia litigation, including the same inequitable conduct defenses[,]" which Merck allegedly admitted were meritorious by seeking reissue of the RE '721 patent, but it nonetheless continued pursuing the lawsuit. (*Id.* ¶ 162.) Merck moved for summary judgment on the inequitable conduct issue, which, on August 22, 2011, the District of New Jersey court denied, holding there was "sufficient indirect and circumstantial evidence" to find Schering had knowledge the prior art it had withheld was material, that "a deliberate decision to withhold that information" could reasonably be inferred, and "Schering does not appear to dispute that it had knowledge of the metabolite information during prosecution." (*Id.* ¶¶ 162–63.) Later, Merck amended its complaint and substituted the RE '461 patent for the '721 patent, which Humana alleges made it more difficult for Mylan to establish its inequitable conduct and other defenses. (*Id.* ¶ 162.) The FDA approved an ANDA application for Mylan's generic on August 7, 2013, but because of the 30-

---

[6] In fact, several Merck's subsidiaries, Schering and Merck Sharp & Dohme, respectively, filed parallel lawsuits alleging patent infringement in the Northern District of West Virginia and the District of New Jersey. *See Schering Corp. et. al. v. Mylan Pharmaceuticals Inc. et. al.*, No. 1:09-cv-00167 (N.D. W. Va.); *Merck Sharp & Dohme Corp. et al. v. Mylan Pharmaceuticals Inc.*, No. 2:09-cv-06383 (D.N.J.). The West Virginia case was filed on December 18, 2009, and voluntarily dismissed on April 15, 2010, and the New Jersey case was filed on December 16, 2009, and was terminated on April 27, 2012, following a bench trial and opinion in which the court found Merck's patent to be valid and enforceable.

month stay provided for by the Hatch-Waxman Act, Mylan was precluded from entering the market. (*Id.* ¶ 147.) Mylan later "dropped nearly all of its defenses and only asserted an inequitable conduct defense" based on the inventorship misrepresentation regarding the RE '461 patent and eventually lost at trial. (*Id.*)

On July 21, 2010, a third company, Teva Pharmaceuticals ("Teva") filed for FDA approval of a generic while Merck's case against Mylan was still pending. (*Id.* ¶ 148.) Merck sued Teva on September 1, 2010, in the District of New Jersey, and on July 7, 2011, the parties entered into a settlement agreement in which Teva agreed not to launch its generic product before April 25, 2017. (*Id.*) Similarly, in August 2012, a fourth company, Sandoz, notified Merck of its ANDA filing for a generic Zetia. (*Id.* ¶ 149.) Merck sued Sandoz for infringement of the RE '461 patent on September 27, 2012; on September 5, 2013, the parties settled, and, like Teva, Sandoz agreed not to release its generic Zetia until April 25, 2017. (*Id.*)

### 7. Reissue of the RE '721 Patent

Schering allegedly applied to reissue the RE '721 patent on June 9, 2010, and admitted its "belie[f] the original patent to be wholly or partly inoperative or invalid[.]" (*Id.* ¶ 114.) During the proceeding, Schering's attorneys proposed amendments to and cancellations of several claims based on inherent anticipation and invalidity. (*Id.* ¶ 115.) They also "finally disclosed" several publications that Humana alleges were key information and wrongfully withheld from the patent examiner during the '115 and RE '721 patent approval processes. (*Id.* ¶ 116.) The RE '721 patent was then reissued as the RE '461 patent on June 14, 2011, in what Humana alleges was an attempt by Merck "to insulate itself from other ANDA filers for Zetia using the dispositive defenses asserted by Glenmark." (*Id.* ¶ 117.)

### 8.  Generic Versions of Zetia Enter the Market

On June 26, 2015, the FDA approved Glenmark's ANDA 78-560, allowing Glenmark to release its generic version of Zetia on December 12, 2016, in accordance with the Zetia Settlement Agreement. (*Id.* ¶ 150.) Glenmark's generic Zetia was the first such generic to enter the market in the United States, as Merck did not release its own authorized generic version until on or about June 12, 2017, when Glenmark's 180-day exclusivity period ended. (*Id.* ¶¶ 151–53.) On that day, the FDA approved ANDAs for new generic versions of Zetia by seven competitor companies. (*Id.* ¶¶ 154–55.) An eighth ANDA was approved in August 2017, and a ninth followed soon thereafter, with approval in December 2017. (*Id.* ¶ 156.)

### 9.  Humana's Causes of Action

The Third Amended Complaint generally alleges that "Merck's overarching monopolistic scheme, Merck and Glenmark's anticompetitive settlement agreement, and Merck, Par, and Glenmark's unlawful business arrangement" violate multiple federal and state antitrust and consumer protection laws. (*Id.* ¶ 8.)

Specifically, Humana asserts the following causes of action: (1) Monopolization in Violation of Various State Antitrust Laws against Merck (Count I) (*id.* ¶¶ 199–204); (2) Conspiracy to Restrain Trade/Restraint of Trade in Violation of Various State Antitrust Laws against all Defendants (Count II) (*id.* ¶¶ 205–09[7]); (3) Unfair and Deceptive Trade Practices in Violation of Various State Unfair Competition and Consumer Protection Laws against all Defendants (Count III) (*id.* ¶¶ 210–307); (4) Monopolistic Scheme in Violation of Various State

---

[7] The Court notes Humana appears to have misnumbered its paragraphs in Count II, which begins with ¶ 205 and ends with ¶ 84, a behemoth paragraph containing 28 subsections and many more sub-subsections. Given Count III begins with ¶ 210, and to keep the numbering consistent and avoid undue confusion, the Court will proceed by subsuming the incorrectly labeled ¶ 84 into ¶ 209.

Antitrust Laws against Merck (Count IV) (*id.* ¶¶ 308–15); (5) Unjust Enrichment Under State Law against all Defendants (Count V) (*id.* ¶¶ 316–28); (6) Monopolization and Monopolistic Scheme in Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, against all Defendants (Count VI) (*id.* ¶¶ 329–41); (7) Attempted Monopolization in Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, against all Defendants (Count VII) (*id.* ¶¶ 342–49); and (8) Conspiracy to Restrain Trade and Restraint of Trade, 15 U.S.C. § 1, against all Defendants (Count VIII) (*id.* ¶¶ 350–62).

### C.    Procedural History

On September 22, 2021, both Humana and Centene Corp. ("Centene"), represented by the same counsel, filed suit in two separate actions against Defendants in the District of New Jersey. (*See* ECF No. 1); *Centene Corp., et al. v. Merck & Co., Inc., et al.*, Case No. 2:23-cv-23033 (D.N.J. Sept. 22, 2021) (ECF No. 1). On October 19, 2021, both cases were transferred from this Court to the Eastern District of Virginia to be part of the MDL. (ECF No. 5.) By the time Humana and Centene filed their respective suits, at least seven other actions involving common questions of fact were transferred by the JPML pursuant to 29 U.S.C. § 1407. (*Id.*)

Two years later, on December 12, 2023, the JPML remanded the *Humana* and *Centene* cases to the District of New Jersey, the original transferor court, following the completion of pretrial proceedings. (ECF No. 7 at 1); *Humana Inc., v. Merck & Co.*, Case No. 2:21-cv-01007 (E.D. Va. Dec. 12, 2023). In a letter submitted on February 6, 2024, Defendants sought to consolidate the two cases, while Humana requested coordination with Centene in fact discovery. (ECF No. 37.) On February 13, 2024, Magistrate Judge Leda D. Wettre ordered that the *Humana* and *Centene* cases should not be consolidated and directed the parties to meet and confer and submit a proposed briefing schedule for motions to dismiss going forward. (ECF No. 38.)

On April 29, 2024, Merck filed a Partial Motion to Dismiss all Vytorin-related claims; Humana's primary theories of liability for monopolization, monopolistic scheme, conspiracy to monopolize; and all state law claims. (ECF No. 46.) Humana opposed (ECF No. 47) and Merck replied (ECF No. 48). This Court issued an opinion on December 30, 2024, granting in part and denying in part Merck's partial motion to dismiss and granting Humana leave to file an amended complaint curing the deficiencies identified in the opinion within 30 days. (ECF No. 57.)

On January 29, 2025, Humana filed its Third Amended Complaint. (ECF No. 61.) On February 21, 2025, the Court entered a notice of voluntary dismissal as to all Glenmark Defendants. (ECF No. 67.) On April 30, 2025, Merck filed this Partial Motion to Dismiss Humana's monopolization and attempted monopolization claims, all state law claims, and the *per se* conspiracy claims. (ECF No. 72.)

## II.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228 ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 545 (alterations in original). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, assuming factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556); *see also In re Generic Pharms. Pricing Antitrust Litig.*, MDL 2724, 16-MD-2724, Case No. 20-3539, 2023 WL 2244685, at *4 (E.D. Pa. Feb. 27, 2023) ("On a motion to dismiss, the Court 'consider[s] plausibility, not probability.'"). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the Court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must

17

now set out "sufficient factual matter" to show that the claim is facially plausible. *Iqbal*, 556 U.S. at 677. This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670. "However, [p]laintiffs are not required 'to plead facts that, if true, definitively rule out all possible innocent explanations.'" *In re Generic Pharms.*, 2023 WL 2244685 at *4. Furthermore, "it is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible." *Id.* (quoting *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017).

While, as a general rule, the Court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis added) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III.    DECISION

Humana's claims against Merck are premised on allegations that Merck sought and/or achieved an illegal monopoly through a series of actions that resulted in Humana paying artificially high prices for Zetia and Vytorin, two cholesterol-lowering medications, and harming competition in the U.S. markets for generic versions of those drugs. (ECF No. 61 ¶¶ 6–8.)

Merck moves to dismiss: (1) the Monopolization theories of *Walker Process*[8] fraud, sham litigation, and Orange Book listing from Counts I, IV, VI, and VII; (2) the Monopolistic Scheme claims from Counts IV and VI; (3) all state law claims asserted in Counts I–V; and (4) the *per se* theory underlying Humana's Conspiracy to Restrain Trade/Restraint of Trade claims from Counts II and VIII. (ECF No. 72 at 9–34.)

## A.  Monopolization in Violation of Federal Antitrust Law—Counts I, IV, VI, and VII

Humana alleges Merck took a series of actions to delay competition and monopolize the market for generic Zetia. (ECF No. 61 ¶¶ 202–03, 309–12, 331–33, 343–46). Humana claims Merck committed fraud, specifically *Walker Process* fraud, by failing to disclose certain key information to the USPTO, initiating meritless litigation purportedly to extend its monopoly, and wrongfully listing patents in the Orange Book for Zetia. (*Id.*) Each of these theories of liability is tied to some aspect of a patent approval or prosecution process. (*Id.*)

A patent grant is the exclusive right to use the patented invention, effectively granting a limited monopoly. *See United States v. Line Material Co.*, *et al.*, 333 U.S. 287, 300 (1948) ("[T]he precise terms of the grant define the limits of a patentee's monopoly and the area in which the patentee is freed from competition."). Under Section 2 of the Sherman Act, a plaintiff must plead two elements to state a monopolization claim: (1) a showing that the defendant possesses monopoly power in the relevant market; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010). The second element in Section 2 cases can be predicated on one or

---

[8] This theory arises out of the Supreme Court's decision in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 389 U.S. 172, 174 (1965).

more theories, including *Walker Process* fraud, sham litigation, wrongful Orange Book listing, a reverse payment scheme, or an overarching scheme. *See In re Lipitor Antitrust Litig.*, MDL No. 2332, Master Dkt. No. 3:12-cv-2389, 2013 WL 4780496, at \*15 (D.N.J. Sept. 5, 2013) (reversed on other grounds). Because patent holders enjoy considerable antitrust immunity, a plaintiff usually must either show a defendant obtained a patent through *Walker Process* fraud or initiated a sham lawsuit with the intent to interfere with a competitor's business. *See In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

## 1. *Walker Process* Fraud Theory

In Counts I, IV, VI, and VII of the Third Amended Complaint, Humana alleges Merck "knowingly" and "willfully" preserved their monopoly power by failing to disclose key information to the USPTO. (ECF No. 61 ¶¶ 204, 315, 333, 346.)

Merck moves to dismiss Humana's theory of monopolization and monopolistic scheme for several reasons. Generally, it contends Humana fails "to overcome the 'considerable antitrust immunity' afforded patent holders like Merck." (ECF No. 72 at 9.) Merck asserts Humana's recycled argument that Merck "fail[ed] to disclose prior art . . . and misrepresent[ed] the true inventors" of the '115 and RE '721 patents is still insufficient and should be dismissed with prejudice because Humana does not "explain [the individuals'] 'roles or degree of involvement' in any metabolization study" (*id.* at 14 (quoting ECF No. 57 at 33)); show the individuals had the requisite specific intent such as "knowledge of [the study's purported] materiality," or that they "intentionally withheld it" from the USPTO (*id.*); or allege "that the June 1997 study or any other purportedly omitted study was 'material to patentability'" (*id.* at 15 (quoting *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 266 (3d Cir. 2017))). Additionally, Merck argues Humana's improper inventorship theory likewise fails because it does not plausibly allege Afonso was an inventor, a

theory previously rejected in the Mylan Litigation "more than a decade ago" (*id.* at 18–20); materiality (*id.* at 20–21); or specific intent (*id.* at 21–22).

In its Opposition, Humana disputes Merck's characterizations of its positions, arguing the Third Amended Complaint provides "the who, what, when, where and how" of the alleged fraud. (ECF No. 73 at 4–7 (quoting *In re Lipitor*, 868 F.3d at 249, 267 (3d Cir. 2017)).) By alleging Burnett and Clader were both inventors on the '115 and RE '721 patents and inventors listed on relevant studies, Humana contends "it is reasonable to infer that as co-authors of the paper documenting the study, Burnett and Clader were involved in the study and knew what they co-wrote" (*id.* at 5), pointing to case law from the Federal Circuit in which the court held intent can be inferred "'from indirect and circumstantial evidence' because 'direct evidence of deceptive intent is rare'" (*id.* at 7 (quoting *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016))). Humana claims it provides sufficient details to show "Burnett and Clader knew, based at least on their involvement with WO '048 and the 1997 [] article, that WO '048 inherently anticipated the metabolites of SCH48461, yet they intentionally withheld that information to secure a patent, with Magatti going so far as to characterize WO '048 as merely providing 'background.'" (*Id.* at 6–7.) Humana also suggests Merck misstates the standard for pleading *Walker Process* fraud claims, arguing "a strong showing of both materiality and intent to deceive" are not always required. (*Id.* at 9.) Regardless, Humana asserts it has met its burden on materiality because it explained "how and why 'the patent[s] would not have issued but for' the omission." (*Id.* at 10.) Humana further argues Merck's reliance on the decisions in the Mylan Litigation for its improper inventorship argument is "an improper application of collateral estoppel." (*Id.* at 11.) Humana contends its allegations Rosenblum and Nelson allegedly had knowledge "Afonso should

have been an inventor and intentionally omitted him from the patent" are sufficient to show intent and materiality. (*Id.* at 11–14.)

Merck replies that Humana still does not "fill the gaps the Court identified" in its prior opinion concerning its failure to disclose theory because: (1) the Third Amended Complaint only alleges "at least two of the inventors named on the '115 patent family" identified SCH48461 but does not identify them, thereby failing to identify the "who" under *In re Lipitor* (ECF No. 74 at 2–3 (citing 868 F.3d at 249)); (2) neither Burnett nor Clader were authors of the June 1997 manuscript/study and Humana does not allege either "had any involvement with or awareness of the manuscript" (*id.* at 3); and (3) Humana does not "allege that Magatti had any 'role[],' 'involvement in,' or even awareness of any metabolization study," let alone the June 1997 manuscript, and therefore "do[es] not specifically allege 'what' [Magatti] knew or 'how' or 'when' [Magatti] knew it" (*id.* at 4). Merck continues that, as a result of these enduring gaps, "there are no facts from which the Court could infer [Burnett, Clader, or Magatti] 'both knew of invalidating information' and 'withheld that information with a specific intent to deceive.'" (*Id.* at 4.) Moreover, Merck insists *Walker Process* fraud claims require but-for causation, as opposed to inequitable conduct claims which only requires a showing "the PTO would not have allowed a claim had it been aware of the undisclosed prior art[,]" (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011)), and, separately, that Humana never alleged any study was material to the patentability of any claim, or even define a claim or any of its limitations. (ECF No. 74 at 5–6.)

Additionally, Merck contends Humana's improper inventorship theory fails in part because Humana does not allege Afonso "conceived of any compounds claimed in the '115 or RE '721 Patents" as "being the first to reduce a compound to practice is not sufficient to show

inventorship," and does not allege "facts 'corroborating' his self-serving letter." (*Id.* at 6.) Merck also notes Humana mischaracterizes Merck's argument about the *Mylan* decision as precluding Humana's claim, whereas Merck merely suggests "the decision is persuasive[.]" (*Id.* at 7.) Merck also claims Humana does not show the patentability of the '115 and RE '721 patents would have been affected had Afonso been disclosed as an inventor. (*Id.* at 7.) Finally, Merck argues Humana does not show any specific individual had the intent to deceive by not including Afonso as an inventor, claiming Rosenberg "averred under oath that Dr. Afonso was *not* an inventor," and Nelson had no duty to disclose as he was neither involved in the patent prosecution nor had knowledge of Afonso's inventorship claims at the time the patents were issued. (*Id.* at 8.)

"[E]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the office, which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability." 37 C.F.R. § 1.5. In *Walker Process*, a pivotal patent infringement case, the Supreme Court held that an action brought to enforce a fraudulently obtained patent violated Section 2 of the Sherman Act so long as all other Section 2 elements are met. 389 U.S. at 174. Subsequent decisions have expounded on so-called *Walker Process* fraud claims to explain they are based in common law fraud, require a showing of actual fraud on the USPTO, and are governed by Federal Circuit law. *See Daiichi Sankyo, Inc. v. Apotex, Inc.*, Civ. A. No. 030937, 2009 WL 1437815, at *5 (D.N.J. May 19, 2009); *see also In re Lipitor Antitrust Litig.*, 855 F.3d 126, 145 (3d Cir. 2017) (plaintiffs asserting *Walker Process* fraud claims must show "the patentee committed fraud before the PTO, that the fraud caused the patent to issue, and that the patentee enforced the fraudulently procured patent"); *TransWeb*, 812 F.3d at 1306 (explaining antitrust plaintiffs must establish each element of

Sherman Act monopolization claim as well as show patent was fraudulently obtained). The higher

pleading threshold for both intent and materiality in *Walker Process* fraud claims requires:

> independent and clear evidence of deceptive intent together with a
> clear showing of reliance, i.e., that the patent would not have been
> issued but for the misrepresentation or omission. Therefore, for an
> omission such as a failure to cite a piece of prior art to support a
> finding of *Walker Process* fraud, the withholding of the reference
> must show evidence of fraudulent intent. A mere failure to cite a
> reference to the PTO will not suffice.

*Nobelpharma*, 141 F.3d at 1070–71 (emphasis added); *see TransWeb*, 812 F.3d at 1303–04 ("A

judgment of inequitable conduct requires clear and convincing evidence of materiality, knowledge

of materiality, and a deliberate decision to deceive."). A plaintiff must show but-for materiality,

"meaning that 'the PTO would not have allowed a claim had it been aware of the undisclosed prior

art.'" *TransWeb*, 812 F.3d at 1304. Furthermore, intent requires "a reasonable inference" of

deceptive intent, defined as "one that is plausible and that flows logically from the facts alleged,

including any objective indications of candor and good faith." *Exergen Corp. v. Wal-Mart Stores,

Inc.*, 575 F.3d 1312, 1329 n.5 (Fed. Cir. 2009).

The Court finds Humana's allegations concerning Merck's purported failure to disclosure

information about relevant scientific studies and inventorship during prosecution of the '115 and

RE '721 patents are still insufficient to support its *Walker Process* fraud theory. Although the

Third Amended Complaint includes additional information relevant to the inquiry—specifically,

details surrounding the metabolization studies allegedly withheld and the name of an individual

whose inventorship was purportedly omitted from the patent application—critical information is

lacking to reasonably establish that some relevant individual had material information and

specifically intended to withhold that information to deceive the USPTO in addition to, and

contemporaneous with, having knowledge of the materiality of that information. For example,

Humana alleges "Schering scientists, including at least two of the inventors named on the '115 patent family, identified SCH48461" (ECF No. 61 ¶ 69), and "at least one other Schering inventor named on the '115 and RE '721 patents committed inequitable conduct by allowing each of the patent applications to be submitted to the USPTO with incorrect inventorship" (*id.* ¶ 72). Humana also alleges Burnett and Clader are named inventors on the '115 and RE '721 patents. (*Id.* ¶ 74.) However, Humana does not actually allege that Burnett and Clader *are* the two inventors who identified SCH48461. (ECF No. 61 ¶¶ 69–76.) Moreover, Humana fails to substantiate its suggestion that Burnett's and Clader's purported 'awareness' of relevant information, such as the June 1997 manuscript, somehow metamorphosed into the specific intent to deceive the USPTO by withholding critical known information. (*Id.* ¶ 76.) Absent this degree of specificity, mere awareness (assuming, *arguendo*, such awareness did exist) does not meet the pleading requirements. *See Nobelpharma*, 141 F.3d at 1070 ("[A] misrepresentation or omission must evidence a *clear intent to deceive the examiner* and thereby cause the [US]PTO to grant an invalid patent.").

Accordingly, Merck's motion to dismiss the *Walker Process* fraud theory is **GRANTED**. Given this was Humana's third time amending its complaint, the dismissal is with prejudice as further amendment would be futile. *See* Fed. R. Civ. P. 15(a)(2).

### 2.  Sham Litigation Theory

Humana alleges the lawsuit by Schering and MSP Singapore, as patent assignee and exclusive licensee, respectively, against Glenmark asserting infringement of the RE '721 patent was meritless and was initiated "for the specific purpose of unlawfully delaying generic competition." (ECF No. 61 ¶¶ 312, 333.)

In its Motion, Merck argues Humana's sham litigation theory "relies entirely on the[] *Walker Process* fraud theory," and should be denied on the same basis. (ECF No. 72 at 22.) It also

25

contends the sham litigation theory should be denied "to the extent it is predicated on the Mylan Litigation" because "Merck won at trial in that case" and a winning suit is, by definition, not a sham. (*Id.* at 23 (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 n.5 (1993)).) Humana claims the Third Amended Complaint cured deficiencies in the *Walker Process* fraud allegations, which should allow its sham litigation claims to proceed "at least to summary judgment." (ECF No. 73 at 14.)

Because the Court reads Humana's sham litigation theory as predicated on its *Walker Process* fraud argument, and in light of the Court's determination the *Walker Process* fraud theory, as alleged, is insufficiently pled, *supra* Section III.A.1., the sham litigation theory likewise fails. Accordingly, Merck's motion to dismiss the sham litigation theory is **GRANTED** with prejudice.

### 3. Wrongfully Listing Patents in the Orange Book

In addition to the *Walker Process* fraud and sham litigation theories of monopolization, Humana alleges Merck wrongfully listed patents in the Orange Book for Zetia knowing that they either did not cover Zetia or were invalid. (ECF No. 61 ¶¶ 196, 202, 312, 333, 346.) Merck argues this theory suffers "from the same deficient allegations of *Walker Process* fraud" and must be dismissed. (ECF No. 72 at 24.) Humana disagrees, instead claiming the Orange Book theory is based on the wrongful listing of: (1) the '966 patent in the Orange Book for Zetia "despite knowing the patent does not cover that product"; (2) the RE '721 patent in the Orange Book for both Zetia and Vytorin with the knowledge "the patent was invalid and unenforceable"; and (3) the '106 patent for Zetia "knowing it was invalid." (ECF No. 73 at 15.) Merck responds Humana does not allege either the '966 or '106 patents "were procured through fraud," so the Orange Book theory cannot proceed. (ECF No. 74 at 8.)

An Orange Book listing can only be deemed wrongful if the relevant patent was obtained through fraud or objectively had no merit. *See Daiichi Sankyo*, 2009 WL 1437815 at *9. Without

such a showing, an Orange Book listing claim cannot proceed. *See id.* Given the insufficiency of the *Walker Process* fraud theory, and the absence of sufficient allegations of fraud in the procurement of the '966 or '106 patents, the Court finds Humana's Orange Book listing theory is still insufficiently pled. Accordingly, Merck's motion to dismiss the Orange Book theory claim is **GRANTED** with prejudice.

### B. Monopolistic Scheme with Schering—Counts IV and VI

Humana argues Merck "knowingly" and "willfully" engaged in a scheme with Schering to monopolize the market for Zetia and/or Vytorin through *Walker Process* fraud, pursuing sham litigation, wrongfully listing patents in the drugs' Orange Books, and by entering into the Zetia Settlement Agreement which allegedly included an illegal reverse payment to delay generic entry and extend Merck's monopoly. (ECF No. 61 ¶¶ 312, 333.)

Merck contends the monopolistic scheme claim should be dismissed to the extent it relies on the insufficiently pled *Walker Process* fraud, sham litigation, and Orange Book listing theories. (ECF No. 72 at 25.) Merck quotes language from this Court's prior opinion granting in part and denying in part Defendants' partial motion to dismiss, in which this Court granted dismissal of Humana's monopolistic scheme claim because "[w]hen specific allegations of conduct are determined to be insufficient to support a claim for relief, a separate claim that is nothing more than a combination of those specific allegations must also be deemed meritless." (*Id.* (quoting ECF No. 57 at 38.) In its opposition, Humana repeats its argument that Merck "merely cross-reference[s] its] earlier arguments regarding the individual grounds" of *Walker Process* fraud, sham litigation, and Orange Book listing. (ECF No. 73 at 16.) Merck insists the "monopolistic scheme theor[y] also fail[s]." (ECF No. 74 at 8.)

Once again, the Court finds the monopolistic scheme is "nothing more than a combination" (ECF No. 57 at 38) of "the individual grounds" of *Walker Process* fraud, sham litigation, and Orange Book listing (ECF No. 73 at 16) and still cannot be accepted, even on Humana's third attempt. Accordingly, Merck's motion to dismiss Humana's monopolistic scheme claim is **GRANTED**, and Counts IV and VI are dismissed with prejudice.

### C.  All State Law Claims—Counts I-V

In general, Merck argues in favor of dismissing state law claims to the extent the claims rely on "deficiently pleaded theories of monopolization[.]" (ECF No. 72 at 26.) Merck tailors its arguments for each state law claim for which it seeks dismissal, and each is discussed in turn.

#### 1.  State Law Antitrust Claims

##### a.  Vermont

Merck points to the parties' joint stipulation that, among other things, Humana fails to state a plausible claim under the Vermont consumer protection and/or unfair and deceptive trade practice statute (ECF No. 46-12, Ex. I, ¶ 1) and should be dismissed on that basis (ECF No. 72 at 26–27.) Humana concedes and does not oppose dismissal. (ECF No. 73 at 1 n.3.) Therefore, Merck's motion to dismiss Humana's Vermont state antitrust claim is **GRANTED**.

##### b.  Montana

Merck contends indirect purchasers are barred from seeking redress under Montana antitrust law pursuant to *Illinois Brick*.[9] (ECF No. 72 at 27.) Humana argues "[a] Montana court expressly rejected this same argument." (ECF No. 73 at 20 (citing *Olson v. Microsoft Corp.*, No. 2000-219, 2001 WL 36083237 (Mont. Dist. Ct. Feb. 15, 2001).) Merck replies "the Montana Supreme Court has held that 'due weight' should be given to 'federal courts' interpretation' of the

---

[9] *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

antitrust laws[,]" and because Montana's statute was modeled after federal law, it "should be interpreted consistent with federal law." (ECF No. 74 at 9 (quoting *Smith v. Video Lottery Consultants, Inc.*, 858 P.2d 11, 13 (Mont. 1993).) Merck points to a decision from the Northern District of California dismissing an indirect purchaser claim brought under Montana law. (*Id.* (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1186–1187 (N.D. Cal. 2009)).)

The Court finds indirect purchasers like Humana are barred from bringing claims under the Montana Unfair Trade Practices Act. *See* Mont. Code. §§ 30-14-101 *et seq.* The recent decision in *Miami Products & Chemical Co. v. Olin Corp.,* 546 F. Supp. 3d 223 (W.D.N.Y. 2021), is instructive. In that case, the court observed the Montana statute defined consumers as individuals purchasing or using goods "for personal, family, or household purposes," and noted the Montana Supreme Court "held that the purchase of goods 'entirely for business purposes' does not 'come within the statutory definition'" of a consumer. *Id.* at 234–35. Just as in *Miami Products*, in which the court ultimately dismissed plaintiffs' indirect purchaser claims under Montana law, here, Humana is undeniably an indirect purchaser given it buys Zetia and/or Vytorin for resale to consumers. *Id.* at 235. *In re TFT-LCD* gives further support for dismissal based on its comparative analysis of the standing requirements under the Sherman Act and Montana antitrust law, concluding "[i]n the absence of any Montana authority holding that indirect purchaser plaintiffs have standing under Montana antitrust law, the Court declines to find so." 599 F. Supp. 2d at 1187.

Accordingly, Merck's motion to dismiss Humana's Montana state antitrust claim is **GRANTED**.

### c. *Puerto Rico*

Merck asserts Puerto Rico law, like Montana law, precludes indirect purchasers from recovering for antitrust injuries under *Illinois Brick*. (ECF No. 72 at 27–28.) Humana disputes this characterization, contending the Puerto Rico Supreme Court has expressly declined to limit recovery to direct purchasers. (ECF No. 73 at 18–19.) Humana cites to a string of cases from multiple jurisdictions suggesting interpretations of Puerto Rico law by Puerto Rican judges are given considerable deference, specifically with respect to whether indirect purchasers should be able to assert antitrust claims under Puerto Rican law. (*Id.* at 19 (citing, e.g., *Rivera-Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010)).) Merck replies that, "[c]ourts consistently reject [Humana's] view" of Puerto Rico law (ECF No. 74 at 9), pointing to a recent decision from the District of Connecticut in which the court dismissed damages claims on behalf of indirect purchasers on the ground that Puerto Rico law has not expressly rejected the *Illinois Brick* antitrust standing limitation and is therefore still subject to it. (*Id.* (citing *Connecticut v. Sandoz, Inc.*, No. 3:20-cv-00802, 2024 WL 4753308, at *24 (D. Conn. Nov. 12, 2024)).)

Courts have long grappled with the antitrust standing implications of *Pressure Vessels P.R., v. Empire Gas P.R.*, a seminal decision from the Supreme Court of Puerto Rico. *See* 137 D.P.R. 497 (1994). *Pressure Vessels* discussed the requirements for pleading an antitrust injury under U.S. Supreme Court precedent and held:

> it is not necessary, in order to satisfy the "by reason of" requirement, for the complaining party to prove anything more than a factual causal link between the harm suffered and the violation of the statute; that is, it is sufficient that, as a result of the violation of the law, the plaintiff has suffered damage.

*Id.* at 520. Since that decision, some courts in Puerto Rico and other jurisdictions have determined that the Puerto Rico Antitrust Act ("PRAA") sanctions claims from both direct and indirect

purchaser-plaintiffs. *See, e.g.*, *Rivera-Muñiz*, 737 F. Supp. 2d at 61; *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478 ("[U]nder the current state of Commonwealth law, there exists a liberal construction of who and whom possess standing to bring to court an antitrust case."); *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 433 (adopting "the Magistrate Judge's finding that indirect purchasers have standing under Puerto Rico law"); *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 651 ("[T]his court concludes the *Illinois Brick* rule does not bar Plaintiffs from proceeding under the PRAA.") On the other hand, many courts have found the PRAA allows only direct purchasers to assert claims for antitrust injuries. *See In re Crop Prot. Prods. Loyalty Program*, 779 F. Supp. 3d at 650 (collecting cases) ("[A] majority of federal district courts have concluded indirect purchasers are barred from seeking damages under the PRAA."); *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *25 (collecting cases) ("I agree with the many district courts that have found that the analysis in *Pressure Vessels* is not an express rejection of the *Illinois Brick* rule.")

The Court is persuaded that the PRAA precludes suits by indirect purchasers. As the court in *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308 at *25, explained very clearly, the language in *Pressure Vessels* construing the PRAA as requiring nothing "more than a factual causal link between the harm suffered and the violation of the statute[,]" concerns the requirements for pleading an antitrust injury, *not* antitrust standing. *Pressure Vessels*, 137 D.P.R. at 520. Although the court in *Pressure Vessels* mentions antitrust standing, the relevant text is situated within the context of an in-depth discussion of the requirements for antitrust injury. *See id.* at 518–21. Indeed, the holding itself refers to the "by reason of" requirement for pleading an antitrust injury. *Id.* at 520. As such, and in the absence of a statute explicitly repealing it (i.e., a "repealer statute"), the *Illinois Brick* rule remains unchanged and applicable to claims brought under the PRAA.

Accordingly, Merck's motion to dismiss Humana's antitrust claim under Puerto Rico law is **GRANTED**.

### d.  Rhode Island

Merck argues Humana's Rhode Island antitrust claim "must be dismissed because Rhode Island followed *Illinois Brick* until it passed a 'repealer statute' in 2013 permitting indirect claims." (ECF No. 72 at 28.) Humana does not dispute that claims tied to injuries occurring before Rhode Island repealed *Illinois Brick* are barred, but asserts it is seeking recovery for injuries incurred after the repealer statute and therefore should be allowed to proceed on that basis. (ECF No. 73 at 16–18.) Merck replies that Humana's claim under the Rhode Island law "must be limited to overcharges incurred after its enactment." (ECF No. 74 at 9.) Accordingly, Merck's motion to dismiss Humana's antitrust claim under Rhode Island law is **GRANTED** with respect to any pre-enactment injuries and **DENIED** with respect to any post-enactment injuries.

### e.  Allegations Regarding Pre-Suit Notice—Arizona, Hawaii, Nevada, Rhode Island, and Utah

Merck contends the "failure to allege compliance with [] states' pre-suit notice requirements" dooms Humana's claims brought under the state antitrust laws of Arizona, Hawaii, Nevada, Rhode Island, and Utah. (ECF No. 72 at 28.) Humana disputes that this is a proper basis for dismissal, arguing courts have declined to dismiss claims on this basis because, whether substantive or procedural, the notice provisions "do not alter the substantive elements of Plaintiff['s] claims and are not a pleading requirement for the Complaints." (ECF No. 73 at 21 (quoting *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 (E.D. Pa. 2019)).) Humana further requests leave to amend in the event the Court grants dismissal for failure to include allegations of compliance with notice requirements. (*Id.* at 22.) In response, Merck notes Humana does not dispute its failure in this regard and claims some cases Humana cites "recognize that

many courts have held that 'a plaintiff's failure to comply with these state notice requirements warrants dismissal.'" (ECF No. 74 at 11 (quoting *Edgar v. Teva Pharm. Indus., Ltd.*, No. 22-2501, 2024 WL 1282436, at *33 (D. Kan. Mar. 26, 2024)).)

The Court finds that, "[r]egardless of whether the relevant notice provisions are substantive or procedural," dismissal for failure to allege compliance with these notice requirements[10] is unwarranted. *In re Generic*, 368 F. Supp. 3d at 835. Merck does not argue, and the Court does not believe, any substantive rights were affected by any such failure. Moreover, Humana claims it complied with these requirements by "sen[ding] notice letters with attached complaints to the State Attorneys General's offices of Arizona, Nevada, and Rhode Island before [it] initially filed" (ECF No. 73 at 21 n.8), thereby eliminating the risk of "forum shopping and the inequitable administration of laws" raised by Merck (ECF No. 74 at 11 (quoting *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 388–89 (D.N.J. 2018))).[11]

Accordingly, Merck's motion to dismiss Humana's antitrust claims under Arizona, Hawaii, Nevada, Rhode Island, and Utah laws for failure to allege compliance with pre-suit notice requirements is **DENIED**.

---

[10] The text of the statutory notice requirements in Arizona, Hawaii, Nevada, Rhode Island, and Utah are substantially similar, generally requiring a copy of a complaint or responsive pleading to be filed with the state attorney general. *See* Ariz. Rev. Stat. Ann. § 44-1415(A); Haw. Rev. Stat. § 480-13.3(a)(1); Nev. Rev. Stat. Ann. § 598A.210(3); R.I. Stat. § 6-36-21; Utah Code Ann. § 76-10-3109(9).

[11] Humana correctly notes the statutory requirements of Hawaii and Utah apply only to class actions on behalf of indirect purchasers and are therefore inapplicable here. (*See* ECF No. 73 at 21 n.8.)

## 2. State Law Consumer Protection Claims

### a. Allegations Alleging Deception or Fraud was Directed at Consumers—Arizona, Colorado, North Dakota, Pennsylvania, and Virginia

Generally, Merck argues state consumer protection laws "require that the challenged conduct relate to a consumer transaction or target consumers[,]" and because Humana purportedly does not make any such allegations, these claims must be dismissed. (ECF No. 72 at 29.) Humana puts forth two core arguments. First, Humana argues its allegation that Merck inflated prices for "drugs dispensed to [its] members" is an allegation of fraud or deception directed at consumers because its members "are indisputably consumers." (ECF No. 73 at 23.) Second, it contends its Third Amended Complaint includes many express allegations "that, among other forms of deceptive and unlawful conduct, Merck entered into an anticompetitive settlement agreement that was hatched in secret, maintained through deception, and caused Merck's drugs to be dispensed to consumers at inflated prices[,]" and claims the statutes "do not require more." (*Id.*) Merck replies that Humana's arguments lack merit because its purchases of Zetia and/or Vytorin were for its own purposes, "rather than for a personal or household use, as is required under these statutes[,]" and its arguments resting on Merck's purported anticompetitive settlement agreement are "[in]sufficient to allege deception." (ECF No. 74 at 11–12.)

The Arizona Consumer Fraud Act declares unlawful any "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, . . . with intent that others rely on [it] . . . in connection with the sale or advertisement of any merchandise," regardless of whether anyone is in fact deceived or mislead. Ariz. Rev. Stat. § 44-1522(A). Colorado's equivalent statute prohibits "[e]ither knowingly or recklessly engag[ing] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice[.]" Colo. Rev. Stat. § 6-1-105(rrr).

34

North Dakota's consumer protection statute likewise prohibits "any deceptive act or practice, . . . with the intent that others rely thereon in connection with the sale or advertisement of any merchandise[.]" N.D. Cent. Code. § 51-15-02. The Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[,]" 73 Pa. Stat. Ann. § 201-3(a), and the Virginia Consumer Protection Act likewise targets numerous enumerated "fraudulent acts or practices committed by a supplier in connection with a consumer transaction[,] Va. Code Ann. § 59.1-200.

Here, the Court finds Humana's allegations are insufficient to establish a claim under Virginia law for a prohibited act "in connection with a consumer transaction" because the allegations focus solely on actions or inactions taking place between and among Merck and other manufacturers, the USPTO, and the FDA. Va. Code Ann. § 59.1-200; (*see generally* ECF No. 61). The same reasoning applies to Humana's claims under Arizona law, which various courts have explained requires some showing of consumer reliance on the alleged fraud or deception. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 403–04 (E.D. Pa. 2010) (citing *Persky v. Turkey*, Nos. 88-1820, 88-2089, 1991 WL 327434, at *9 (D. Ariz. Dec. 19, 1991)) (explaining plaintiffs must allege not only fraudulent misrepresentations but "that those misrepresentations were relied upon by consumers"); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 222–23 (S.D.N.Y. 2012) (holding plaintiff stated a claim under Arizona law because "[i]n paying supra-competitive prices for DDAVP, consumers arguably relied" upon misrepresentations). Similarly, the Court finds Humana's allegations are insufficient to state a claim under Colorado's consumer protection statute because they do not

reasonably establish any prohibited conduct "intended to induce consumer reliance[.]" *Sheet Metal Workers*, 737 F. Supp. 2d at 408.

By contrast, the Court finds Humana sufficiently states a claim under the Pennsylvania statute because Humana's allegations concern purported deception and/or fraud in the patent procurement process, whereas *In re Niaspan Antitrust Litig.*, on which Merck relies, concerns solely anticompetitive allegations. (ECF No. 72 at 29 (citing 42 F. Supp. 3d 735, 760 (E.D. Pa. 2014)).) Similarly, Humana's allegations are sufficient to state a claim under North Dakota's consumer protection law because they arise out of allegedly fraudulent or deceptive conduct, and the statute does not require allegations of reliance. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 197–98 (D. Maine 2004) (citing N.D. Cent. Code § 51-15-02; *see also In re Generic*, 368 F. Supp. 3d at 846.

Accordingly, Merck's motion to dismiss Humana's consumer protection claims under Arizona, Colorado, and Virginia law is **GRANTED**, and Merck's motion to dismiss Humana's consumer protection claims under Pennsylvania and North Dakota law is **DENIED**.

### b. *Recasting of antitrust claims as consumer protection claims to circumvent* Illinois Brick—*Indiana, Louisiana, and Missouri*

Merck contends Humana's claims under Indiana and Louisiana consumer protection laws must be dismissed because "'to permit an indirect purchaser . . . to recast his antitrust claim as a consumer fraud violation would . . . essentially permit an end run around the policies allowing only direct purchasers to recover under the' state's antitrust laws." (ECF No. 72 at 29–30 (quoting *In re K-Dur Antitrust Litig.*, Civ. A. No. 01-1652, 2008 WL 2660778, at *3 (D.N.J. Feb. 25, 2008) (internal citation omitted)).) Humana responds courts have rejected such repackaging arguments because "states remain free to permit recovery by indirect purchasers." (ECF No. 73 at 26 (quoting *In re Generic*, 368 F. Supp. 3d at 840 (internal citation omitted)).) Humana further notes "Merck

even raised the same argument in the Zetia MDL with respect to the end-payor plaintiff class's claims under Missouri law, and the MDL court correctly rejected the argument." (*Id.*) Merck does not offer an argument in response.

The Indiana Deceptive Consumer Sales Act prohibits "unfair, abusive, or deceptive act[s], omission[s], or practice[s] in connection with a consumer transaction." Ind. Stat. § 24-5-0.5-3(a). It "is a remedial statute and 'shall be liberally construed and applied to promote its purposes and policies.'" *Kesling v. Hubler Nissan, Inc.*, 997 N.E. 2d 327, 332 (Ind. 2013) (quoting Ind. Stat. § 24-5-0.5-1). The Louisiana Unfair Trade Practices and Consumer Protection Act, *see* 51 La. Rev. Stat. §§ 1400 *et seq.*, prohibits similar acts and requires plaintiffs to be either "direct consumer[s] or business competitor[s]" to have standing to sue under the statute. *Washington Mut. Bank v. Monticello*, 976 So. 2d 251, 258 (La. Ct. App. 2008). Similarly, a majority of courts addressing the issue have concluded "*Illinois Brick* does not bar indirect-purchaser claims under the [Missouri Merchandising Practices Act]." *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1079 (S.D. Cal. 2017).

The Court finds Humana's claims under Indiana, Louisiana, and Missouri consumer protection laws are viable claims independent of any other claims brought under the states' antitrust laws. As explained in *In re Generic*, plaintiffs "are not barred from pursuing such a recovery under the various state consumer protection laws so long as their allegations are enough to plead the relevant consumer protection violation." 368 F. Supp. 3d at 840. Provided Humana can state a claim for relief under the consumer protection laws of Indiana, Louisiana, and Missouri, the Court sees no reason why *Illinois Brick*'s limitation on indirect purchaser recovery for antitrust violations should be applied to these state law claims.

Accordingly, Merck's motion to dismiss Humana's Indiana, Louisiana, and Missouri consumer protection claims is **DENIED**.

### c.  *Allegations Zetia and/or Vytorin purchases were for personal, familial, or household use—Mississippi and Missouri*

Because Humana is a health plan provider, Merck contends it cannot allege its Zetia and/or Vytorin purchases were for personal, familial, or household use, as the Mississippi and Missouri consumer protection laws require. (*See* ECF No. 72 at 30.) Humana argues its purchases of the drugs are sufficient to confer standing to sue because the drugs were dispensed "to [its] members for personal use" (ECF No. 73 at 28), and that courts in Mississippi and Missouri allow "third-party payors" like Humana to bring claims under their respective consumer protection statutes (*id.* at 29–30). Merck reiterates Humana's claims are not allowed under the statutes as the purchases were not made for an allowable use. (ECF No. 74 at 12.)

Courts have found the Mississippi statute defines "person" as including businesses, and explained "an insurer, standing in as a proxy for the end-user, not as an independent buyer in the business of reselling the product as a retailer or distributor" has standing to sue. *Staley v. Gilead Sciences, Inc.*, 589 F. Supp. 3d 1132, 1141 (N.D. Cal. 2022) (citing Miss. Code Ann. § 75-24-15). Similarly, another court in this Circuit recently held the Missouri Merchandising Practices Act defines "person[s]" who may bring claims as "includ[ing] entities." *Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*, Civ. A. No. 23-828, 2023 WL 8018980, at *16 (E.D. Pa. Nov. 20, 2023) (citing Mo. Ann. Stat. § 407.010(5)).[12]

Here, the Court is persuaded that the Mississippi Consumer Protection Act and the Missouri Merchandising Practices Act contain broad language allowing claims by indirect purchasers like

---

[12] Indeed, Merck was the defendant in *Mayor and City Council of Baltimore* and pursued this argument unsuccessfully. 2023 WL 8018980, at *15.

Humana. Both statutes expressly define the category of persons who may bring suit to include not only natural persons but also business entities like Humana. *See* Miss. Code Ann. § 75-24-3; Mo. Ann. Stat. § 407.010(5). Moreover, taking Humana's allegations as true, as it must at this stage, the Court finds Humana's Zetia and/or Vytorin purchases were made for and on behalf of its members, who are natural persons making personal, familial, and household use of them. (ECF No. 61 ¶¶ 251, 255.)

Accordingly, Merck's motion to dismiss Humana's consumer protection claims under Mississippi and Missouri law is **DENIED**.

### d. "Natural persons"—Nevada and West Virginia

Merck asserts "only natural persons may bring suit under these states' consumer protection laws[,]" and therefore Humana's claims under Nevada and West Virginia consumer protection laws cannot go forward. (ECF No. 72 at 30–31.) Humana disputes this, arguing first that the Supreme Court of Nevada as well as "multiple federal courts" have recently changed course, holding that "non-natural persons may bring consumer protection claims[.]" (ECF No. 73 at 30–31.) Humana also claims Merck's argument relies on a defunct version of the West Virginia statute, which now allows organizations like Humana to state claims. (*Id.* at 31–32.) Merck replies that Humana's position "ignore[s] other decisions rejecting" claims by non-persons under Nevada law, and that Humana's claims are not governed by West Virginia's statutory amendment broadening the class of plaintiffs because the claims accrued before the amendment was enacted. (ECF No. 74 at 13.)

The Nevada Deceptive Trade Practices Act prohibits, among other things, knowingly making false representations in a transaction, Nev. Rev. Stat §§ 598.0915–.0925, and expressly delegates enforcement authority to various state actors, including the Attorney General, *id.* § 598.096, with the exception of civil actions by elderly persons or persons with disabilities, *id.* § 598.0977. *See In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 163 (E.D. Pa. 2009) (finding

that "[t]he defendants are correct" the Nevada statute grants causes of action to elderly or disabled people only); *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, No. 1:14-md-508, 2015 WL 5166014, at *31 (E.D. Tenn. June 24, 2015) (same); *but see In re Fragrance Direct Purchaser Antitrust Litig.*, Nos. 2:23-02174, 2:23-03249, 2:23-16127, 2025 WL 579639, at *22 (D.N.J. Feb. 21, 2025) (holding that the Nevada consumer protection act provides "enhanced relief for some classes of individuals, including elderly, disabled, or minor persons, but does not bar recovery by other persons"); *Del Webb Cmties., Inc. v. Partington*, 652 F.3d 1145, 1152–53 (9th Cir. 2011) (noting the Nevada statute provides "[a]n action may be brought by any person who is a victim of consumer fraud" including business competitors); *In re DDAVP*, 903 F. Supp. 2d at 226–27 (determining "any victim of consumer fraud may bring a civil action" under the Nevada statute).

The West Virginia consumer protection statute, known as the Consumer Credit and Protection Statute, W. Va. Code §§ 46A-6-101 *et seq.*, protects consumers against "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[,]" *id.* § 46A-6-104. As of June 12, 2015, it defines "consumer[s]" as "natural person[s]." *Id.* § 46A-6-102. An earlier version of the West Virginia statute also required plaintiffs to be "natural persons who purchased goods for household, personal, or family purposes[.]" *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118–19 (N.D. Cal. 2007).

Here, the Court finds the Nevada consumer protection statute does not limit standing to natural persons, but the West Virginia law does. The subsections providing definitions of key terms in the Nevada law do not define "person" but do define "elderly person[,]" Nev. Rev. Stat § 598.0933, and "person with a disability[,]" *id.* § 598.0936. This strongly suggests, as the court found in *In re Fragrance Direct Purchaser Antitrust Litig.*, that the Nevada law intended

"enhanced relief" for those classes of individuals, but not to exclude all other claimants. Moreover, the Court is persuaded by the case law that any victim of consumer fraud, including business entities, may file suit under the Nevada statute. *See Del Webb*, 652 F.3d at 1152–53; *In re DDAVP*, 903 F. Supp. 2d at 226–27. With respect to the West Virginia law, the parties appear to agree the statute required plaintiffs to be natural persons throughout the period during which Humana's claims accrued, and the Court concurs. (*See* ECF Nos. 73 at 31; 74 at 13.)

Accordingly, Merck's motion to dismiss Humana's consumer protection claims is **GRANTED** with respect to Humana's claim under West Virginia law and **DENIED** with respect to Humana's claim under the Nevada law.

### e. State consumer protection laws extending to pure antitrust violations—Illinois and Wyoming

Merck's position is that Humana's consumer protection claims under Illinois and Wyoming statutes, given they "are predicated entirely on alleged anticompetitive conduct," must be dismissed because the statutes are not meant to provide duplicative causes of action for a single set of alleged antitrust violations. (ECF No. 72 at 31.) In its Opposition, Humana argues the Illinois consumer protection law covers "conduct that may also be covered by antitrust law" (ECF No. 73 at 32), and that Merck's argument "disregards the plain language of the [Wyoming] statute[,]" which "is broad enough to encompass Merck's alleged misconduct here" (*id.* at 33). With respect to the Illinois statute, Merck claims "the law is not 'an additional enforcement mechanism for all antitrust violations'" (ECF No. 74 at 13 (quoting *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 831 (7th Cir. 2014))), where the "allegations of consumer fraud overlap entirely with the allegations of anticompetitive conduct" (*id.* (quoting *In re Effexor*, 357 F. Supp. 3d at 395–96)). Merck also argues Humana offered no cases to show similar claims going forward under the Wyoming law, whereas "courts regularly dismiss antitrust claims like [Humana's]." (*Id.* at 14.)

The Illinois Consumer Fraud and Deceptive Business Practices Act, *see* 815 Ill. Comp. Stat §§ 505/1–12, targets a broad range of "unfair methods of competition and unfair or deceptive acts or practices," *id.* § 505/2. The Supreme Court of Illinois has held "the language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others" and "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism." *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990); *see In re Interior Molded Doors Antitrust Litig.*, Civ. A. Nos. 3:18-cv-00718, 3:18-cv-00850, 2019 WL 4478734, at *21 (E.D. Va. Sept. 18, 2019) (relying on *Laughlin* in dismissing plaintiffs' consumer protection claim under Illinois law where the claim was based on the same set of conduct as their asserted antitrust claims).

The Wyoming Consumer Protection Act, *see* Wyo. Stat. Ann. §§ 40-12-101 *et seq.*, "is targeted at 'unscrupulous and fraudulent marketing practices' that are distinguishable from allegations of antitrust violations, and moreover, the Wyoming legislature has seen fit to provide a scheme to redress antitrust violations through enactment of a separate antitrust statute." *In re Dynamic Random Access Memory (Dram)*, 516 F. Supp. 2d at 1120 (internal citation omitted). The Supreme Court of Wyoming dismisses claims brought under the statute which pertain to conduct more directly covered by a separate statutory scheme. *See Herrig v. Herrig*, 844 P.2d 487, 495 (Wyo. 1992).

Here, the Court is not persuaded the Illinois or Wyoming consumer protection statutes provide additional causes of action for a set of conduct covered entirely by the respective state's antitrust laws. Although distinct claims arising out of a common set of facts are regularly pursued in the judicial system, this practice can be limited by the legislature or judiciary, as both states have

done. *See Laughlin*, 550 N.E.2d at 993; *Herrig*, 844 P.2d at 495. Accordingly, Merck's motion to dismiss Humana's consumer protection claims under Illinois and Wyoming law is **GRANTED**.

### 3. Unjust Enrichment Claims

#### a. *Recasting of antitrust claims as unjust enrichment claims to circumvent* **Illinois Brick**— *Delaware, Georgia, Kentucky, Louisiana, New Jersey, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming*

Merck contends *Illinois Brick*'s prohibition on indirect purchasers from recovering for antitrust violations bars unjust enrichment claims brought on behalf of an indirect purchaser like Humana. (ECF No. 72 at 31–32.) In its Opposition, Humana considers Merck's position untenable, arguing "courts have declined to dismiss unjust enrichment claims simply because a particular state has not repealed *Illinois Brick*[,]" and insisting the Court should do the same. (ECF No. 73 at 34 (citing *In re Generic*, 368 F. Supp. 3d at 849–50).)

Unjust enrichment is an equitable theory centered on the principle that "a person shall not be allowed to enrich himself unjustly at the expense of another." *Assocs. Com. Corp. v. Wallia*, 511 A.2d 709, 716 (N.J. Super. Ct. App. Div. 1986). It can be pled in the alternative even where there appears to be an adequate remedy at law. *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008) (citing Fed. R. Civ. P. 8(d)(2)–(3)).

Here, the Court finds *Illinois Brick* has no effect on Humana's unjust enrichment claims. The antitrust concerns surrounding the effect of *Illinois Brick* in barring indirect purchasers "are not implicated in the context of unjust enrichment claims because 'the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs.'" *In re Generic*, 368 F. Supp. 3d at 850 (citing *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 280 (E.D. Pa. 2013)). Indeed, the Court is convinced "[n]o reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust

violation, but also dispossesses the same person of his right to pursue a common law equitable remedy." *In re G-Fees*, 584 F. Supp. 2d at 46.

Accordingly, Merck's motion to dismiss Humana's unjust enrichment claims under Delaware, Georgia, Kentucky, Louisiana, New Jersey, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming law is **DENIED**.

### b. *Allegations Humana conferred a direct benefit on, or had a direct relationship with, Merck—Alabama, Georgia, Kentucky, Maine, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, Utah, and Wyoming*

Merck claims Humana's allegations "make clear that [its] indirect purchaser claims do not stem from any direct dealings [it] allegedly had with (or any direct benefit they allegedly conferred on) Merck[,]" whereas these states' laws restrict unjust enrichment claims to precisely those types of direct interactions. (ECF No. 72 at 32–33.) Humana suggests Merck's narrow interpretation of the legal requirements masks the central question, which is "whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct[,]" which Humana argues emphatically they are. (ECF No. 73 at 35–36 (quoting *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)).) Humana asserts the cases on which Merck relies are unavailing because they: (1) rely on incorrect and unsubstantiated assumptions (*id.* at 36); (2) provide shallow explanations for how and why "allegations that overpayments indirect purchasers made, and benefitted the defendant, fail to satisfy" direct benefit requirements (*id.* at 37); and (3) are grounded in reasoning refuted by other cases cited by Merck (*id.* at 37–38). In its Reply, Merck argues the cases Humana cites "paint[] with a broad brush" rather than engaging with each state's unjust enrichment laws. (ECF No. 74 at 14.) Merck insists courts have consistently found indirect purchasers "'do not plead a direct benefit' and thus cannot bring claims under states that 'require that a plaintiff confer a direct benefit on the defendant.'" (*Id.* at 15 (quoting *In re Novartis & Par Antitrust Litig.*, 18 Civ.

4361, 5536, 5603, 5708, 5886, 6776, 9861, 11835, 12293, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019)).)

The requirements for unjust enrichment in the various states differ in important ways. One set of states—Alabama, Georgia, New Jersey, North Carolina, North Dakota, Pennsylvania, Utah, and Wyoming—requires a direct benefit be plead for unjust enrichment claims. *See Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Southeast, Inc.*, Civ. A. No. 2:09-192, 2011 WL 2893629, at *6 (M.D. Ala. July 29, 2011) ("Since the individual defendants enjoyed no direct benefit, the unjust enrichment claim against them is due to be dismissed"); *Archer v. Holmes*, Civ. A. No. 1:17-2051, 2018 WL 534475, at *5 (N.D. Ga. Jan. 23, 2018) ("[I]n Georgia, unjust enrichment claims lie only in those situations where a defendant has received a direct benefit from a plaintiff."); *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 723–24 (D.N.J. 2011) (finding plaintiffs fail to state a claim for unjust enrichment "since they never directly conferred a benefit on Defendants"); *Norman Owen Trucking, Inc. v. Morkoski*, 506 S.E.2d 267, 273–74 (N.C. Ct. App. 1998) (same); *Midland Diesel Serv. v. MDU Res. Grp., Inc.*, 307 N.W.2d 555, 557 (N.D. 1981) (explaining a claimant sufficiently states a claim for unjust enrichment where a defendant "obtained a benefit at the direct expense" at his or her expense); *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 721 (E.D. Pa. 2013) ("The 'benefit' must be conferred by the plaintiff directly[.]"); *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015) ("A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff."); *Boyce v. Freeman*, 39 P.3d 1062 (Wyo. 2002) (finding defendant "received no direct benefit from this action" and affirming the lower court's denial of plaintiff's unjust enrichment claim following a bench trial).

The second set of states do not require such directness. Kentucky law only requires "the plaintiff must allege that it conferred a benefit on the defendant[,]" allowing both direct and indirect benefits to state a claim for unjust enrichment. *Dixie Fuel Co., LLC v. Straight Creek, LLC*, Civ. No. 08-326, 2011 WL 845828, at *4–5 (E.D. Ky. Mar. 8, 2011). Similarly, in Maine, a plaintiff must confer a benefit on a defendant to plead an unjust enrichment claim, but the Supreme Judicial Court has explained that benefit can be received from the plaintiff or "anyone else," and therefore need not be direct. *Platz Associates v. Finley*, 973 A.2d 743, 751 (Me. 2009). Rhode Island law defines the concept of "benefit" broadly, explaining it "denotes any form of advantage." *State v. Lead Indus. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830, at *15 (R.I. Super. Apr. 2, 2001) (citing Restatement of Restitution § 1, cmt. b (1937)). Finally, in *Sperry v. Crompton Corp.*, the New York Court of Appeals concluded the connection pleaded by the plaintiff was "simply too attenuated" to support an unjust enrichment claim. 863 N.E. 3d 1012, 1018 (N.Y. Ct. App. 2007). After *Sperry*, courts have been split with respect to whether the phrase "too attenuated" automatically disqualifies all indirect purchasers, or those plaintiffs who can make "an adequate factual showing as to traceability" can proceed. *See In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2021 WL 4306018, at *27–28 (N.D. Cal. Sept. 22, 2021).

The Court concludes Humana cannot state a claim for unjust enrichment under Alabama, Georgia, New Jersey, North Carolina, North Dakota, Pennsylvania, Utah, and Wyoming law because it cannot allege the requisite degree of directness in benefit conferred. Humana's allegations involve at least one "intermediary in the chain of distribution from which it purchased Zetia, Vytorin, and generic Zetia," and therefore it cannot claim it directly conferred a benefit to Merck. (ECF No. 61 ¶ 321.) Conversely, the Court finds the laws for unjust enrichment in Kentucky, Maine, New York, and Rhode Island do not require such directness, and Humana's

allegations are sufficient at this stage to show it conferred a benefit on Merck through its payment of allegedly inflated prices. (*Id.* ¶ 328.)

Accordingly, Merck's motion to dismiss Humana's claims under Alabama, Georgia, New Jersey, North Carolina, North Dakota, Pennsylvania, Utah, and Wyoming law is **GRANTED**, and its motion to dismiss Humana's claims under Kentucky, Maine, New York, and Rhode Island law is **DENIED**.

### c. *Affirmatively alleging an adequate remedy at law exists under antitrust and consumer protection laws— California, Hawaii, and New York*

Merck claims plaintiffs proceeding under California, Hawaii, or New York law "cannot bring a claim for unjust enrichment where an adequate remedy at law exists." (ECF No. 72 at 33.) Humana asserts Federal Rule of Civil Procedure 8 "permits alternative pleading of claims" and insists the cases Merck cites do not address this controlling rule. (ECF No. 73 at 38–39.) Merck reiterates the laws of the respective states preclude equitable claims where a plaintiff fails to allege it lacks an adequate remedy at law and expresses concern these claims are duplicative of other claims. (ECF No. 74 at 15 (citing *Bolos v. Waldorf Astoria Mgmt. LLC*, 762 F. Supp. 3d 975, 1016–17 (D. Haw. 2025)).)

"A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). Plaintiffs may not, however, "obtain 'double recovery' by an award in equity for damages also obtained at law." *Bolos*, 762 F. Supp. 3d at 1017.

At this stage of the litigation, given Federal Rule of Civil Procedure 8's allowance for alternative pleading, and the Court's duty to draw all inferences in Humana's favor, the Court finds Humana has pleaded sufficient facts to plausibly state claims for unjust enrichment under

California[13], Hawaii, and New York law. *See* Fed. R. Civ. P. 8(d)(2); *Iqbal*, 556 U.S. at 678; *see also In re Generic*, 368 F. Supp. 3d at 851 (declining to "dismiss . . . unjust enrichment claims based on Defendant's argument regarding an adequate legal remedy"). Merck's concern for duplicative claims, though generally well-founded, is not so pressing in a case involving dozens of claims the Court has already allowed to proceed.

Accordingly, Merck's motion to dismiss Humana's unjust enrichment claims under California, Hawaii, and New York law for failure to allege an inadequate remedy at law is **DENIED**.

### d.   Unjust enrichment as standalone cause of action—Mississippi

Merck argues Humana's unjust enrichment claims under Mississippi must be dismissed as Mississippi does not recognize unjust enrichment as an independent cause of action. (ECF No. 72 at 33–34.) Humana counters that courts applying Mississippi law have allowed unjust enrichment claims to proceed. (ECF No. 73 at 39–40.)

While it is not a standalone cause of action in Mississippi, unjust enrichment is readily recognized as a remedy "where there is no legal contract and 'the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another.'" *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 620 F. Supp. 3d 532, 544 (S.D. Miss. 2022) (quoting *Powell v. Campbell*, 912 So. 2d 978, 982 (Miss. 2005)). Given that

---

[13] Although unjust enrichment is not a standalone cause of action in California, it "can be construed as a claim that the plaintiff is entitled to restitution under a theory that 'the defendant obtained a benefit from the plaintiff by fraud' and the plaintiff 'choose[s] not to sue in tort, but instead to seek restitution on a quasi-contract theory (an election referred to at common law as waiving the tort and suing in assumpsit).'" *In re Hard Disk Drive*, 2021 WL 4306018, at *24 (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004)).

courts in Mississippi appear to regularly allow unjust enrichment claims to proceed under a quasi-contract theory of restitution, the Court sees no reason to dismiss Humana's claim.

Accordingly, Merck's motion to dismiss Humana's unjust enrichment claims under Mississippi law is **DENIED**.

### D. *Per Se* Conspiracy to Restrain Trade/Restraint of Trade – Counts II and VIII

Merck argues Humana "improper[ly] attempt[s] to reassert" the *per se* conspiracy to restrain trade theory, which was previously rejected by the Court in its prior order. (ECF No. 72 at 34.) Humana concedes without "conced[ing] the correctness" of the ruling. (ECF No. 73 at 1 n.3.) Accordingly, Merck's motion to dismiss Humana's *per se* conspiracy to restrain trade claim is **GRANTED**, and Counts II and VIII are dismissed with prejudice.

### IV.    CONCLUSION

For the reasons set forth above, and for good cause having been shown, Merck's Partial Motion to Dismiss (ECF No. 72) is **GRANTED** in part and **DENIED** in part. Specifically, the Motion is **GRANTED WITH PREJUDICE** as to Humana's: (1) *Walker Process* fraud, sham litigation, and Orange Book theories of Monopolization from Counts I, IV, VI, and VII; (2) Monopolistic Scheme claims (Counts IV and VI); and (3) *Per Se* Conspiracy to Restrain Trade/Restraint of Trade (Counts II and VIII). The Motion is **GRANTED WITHOUT PREJUDICE** as to the following state law claims:

1) **State Law Antitrust Claims**
   a. Vermont
   b. Montana
   c. Puerto Rico
   d. Rhode Island (to the extent of pre-enactment injuries)

2) **State Law Consumer Protection Claims**
   a. Arizona
   b. Colorado
   c. Virginia
   d. West Virginia

e.  Illinois
f.  Wyoming

**3)  Unjust Enrichment Claims**
a.  Alabama
b.  Georgia
c.  New Jersey
d.  North Dakota
e.  Pennsylvania
f.  Utah
g.  Wyoming

The Motion is **DENIED** as to following state law claims:

**1)  State Law Antitrust Claims**
a.  Rhode Island (to the extent of post-enactment injuries)
b.  Arizona
c.  Hawaii
d.  Nevada
e.  Rhode Island
f.  Utah

**2)  State Law Consumer Protection Claims**
a.  Pennsylvania
b.  North Dakota
c.  Indiana
d.  Louisiana
e.  Missouri
f.  Mississippi
g.  Nevada

**3)  Unjust Enrichment Claims**
a.  Delaware
b.  Georgia
c.  Kentucky
d.  Louisiana
e.  Oklahoma
f.  Texas
g.  Virginia
h.  Washington
i.  Wyoming
j.  Maine
k.  New York
l.  Rhode Island
m.  California
n.  Hawaii

o.  Mississippi


An appropriate Order follows.


Date: September 4, 2025                    */s/ Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**